UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| MARIAM K. SLAYHI, | Case No. 06-CV-2210 (PJS/JJG) |
| Plaintiff, | |
| v. | ORDER |
| HIGH-TECH INSTITUTE, INC., an Arizona corporation, | |
| Defendant. | |

---

Daniel B. Johnson, DANIEL B. JOHNSON & ASSOCIATES, PA, for plaintiff.

Bryan N. Smith and Andrew J. Voss, LITTLER MENDELSON, P.C., for defendant.

In this suit under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. ch. 18, plaintiff Mariam Slayhi seeks to recover from her former employer, defendant High-Tech Institute, Inc. ("High-Tech"), for health-care costs that she incurred in connection with the birth of her daughter. Slayhi alleges that those health-care costs should have been covered under a health-insurance plan sponsored by High-Tech. High-Tech disagrees and now moves for summary judgment. For the reasons that follow, the Court grants in part and denies in part High-Tech's motion.

## I. BACKGROUND

### A. The Underlying Events

The relevant facts are undisputed. Slayhi was employed full-time as a massage-therapy instructor by High-Tech, a vocational and technical school. High-Tech offers its full-time employees health-insurance coverage through Aetna Life Insurance Company ("Aetna"). Under

the terms of the High-Tech employee manual, the cost of the health insurance is borne in part by High-Tech and in part by each covered employee.  Slayhi elected individual coverage in January 2002, shortly after she became eligible.

In late July 2003, Slayhi asked High-Tech for three months of maternity leave, from August through October 2003.  Slayhi was eligible for such leave under High-Tech's Family and Medical Leave Act ("FMLA") policy.  High-Tech granted Slayhi the leave she requested.

During the year and a half before Slayhi went on leave, High-Tech routinely and automatically deducted Slayhi's share of her health-insurance premiums from her paychecks. After her leave began in early August 2003, Slayhi received another two paychecks that month, and High-Tech deducted her share of the August health-insurance premium from those paychecks.  Slayhi received no paychecks in September or October, because by then her leave was unpaid.  Consequently, High-Tech could not deduct her share of those months' premiums from her (nonexistent) paychecks.  Nor did Slayhi pay her share of the September and October premiums out of her own pocket.

Slayhi gave birth in September 2003.  When she was admitted to the hospital before giving birth, Slayhi called Aetna to secure approval of the admission.  Smith Decl. Ex. A (Slayhi Dep.) at 17 [Docket No. 8].  Soon after the birth, Slayhi contacted Aetna to add her newborn daughter as a dependent on her health-insurance plan.  Slayhi Dep. at 28.  Slayhi also asked Aetna to preapprove a postnatal home visit, which Aetna did on September 22.  The approval notice from Aetna to Slayhi said:

> We have received your request for coverage verification and authorization for . . . [one home visit between 9/22/2003 and 11/22/2003].  This service has been approved. . . .  All three components of Aetna's authorization process have been satisfied:

- *Aetna has verified the member's eligibility*; and

- Aetna has verified that the plan provides coverage for the type of selected procedures or services; and

- Aetna has verified the medical necessity of selected procedures or services specifically described in this letter.

Slayhi Aff. Ex. F [Docket No. 14] (emphasis added).

In October, Slayhi realized that she would not be able to return to work in November as she originally planned. She went to High-Tech's offices in early October to discuss with her supervisor the possibility of taking additional leave and then working part time after she returned from that additional leave. Slayhi Dep. at 24-25. During this same visit to High-Tech, Slayhi also asked High-Tech's office manager whether her health-insurance paperwork was in order. *Id.* at 25-26. The office manager said that it appeared to be and that High-Tech would contact Slayhi by mail if High-Tech needed any other paperwork from her. *Id.* at 26, 36-37.

Slayhi's supervisor never directly told Slayhi whether High-Tech would grant or deny her request for extended leave followed by part-time status. Instead, the supervisor promised twice — first in early October in person, and then in mid-October by phone — to look into the matter and get back to Slayhi. *Id.* at 25, 29. Slayhi did not hear from her supervisor or anyone else at High-Tech until she received a formal notice dated November 17, 2003, which advised Slayhi that her health insurance had been retroactively terminated as of September 1 and informed her that she could continue her health-insurance coverage at her own expense under COBRA (the federal Consolidated Omnibus Reconciliation Act of 1986). Slayhi Aff. Ex. G; Slayhi Dep. at 29-31.

The COBRA notice reflected, albeit indirectly, that High-Tech had decided to terminate Slayhi's employment as of November 1, 2003, because her approved leave had run out and she

-3-

had not returned to work.  *See* Gilmore Aff. ¶ 4 [Docket No. 9].  In other words, High-Tech

essentially used a COBRA notice to tell Slayhi that she had been fired.  After deciding to

terminate Slayhi's employment, High-Tech told Aetna of the termination and informed Aetna

that Slayhi had not paid her share of her health-insurance premiums for either September or

October 2003.  *Id.* ¶ 5.

High-Tech's employee manual, which Slayhi agrees she received, provides that

employees on FMLA leave are "required to make their portion of the monthly premium

payments on the 1st of each month."  Slayhi Dep. Ex. 7 at HTI/Slayhi000249; Slayhi Dep. at 13-

15.  A similar message is repeated on the form that Slayhi submitted to request FMLA leave,

which informed Slayhi that "[d]uring this leave you must make your share of the premiums

when due."  Slayhi Aff. Ex. D.  But on High-Tech's leave-approval form, High-Tech told Slayhi

the following:

> If you normally pay a portion of the premiums for you[r] health
> insurance, you must continue to make your portion of the premium
> payments while on leave. . . . When all vacation and/or sick leave
> has been used and you are not receiving any other form of
> compensation for hours worked you are required to make your
> portion of the monthly premium payment on the 1st of every
> month.  *You have a minimum 30-day grace period* in which to
> make payment.  If payment is more than 30 days late, your group
> health insurance will be canceled, *provided we notify you in
> writing at least 15 days before* the date your health coverage will
> lapse.

Slayhi Aff. Ex. E. (emphasis added).

High-Tech never dunned Slayhi for her share of her health-insurance premiums.  Slayhi

Dep. at 27-28, 37.  Nor did High-Tech give Slayhi any advance notice that her health-insurance

coverage was about to be terminated.  Instead, High-Tech simply represented to Aetna that

Slayhi had failed to pay the required premiums as of September 1.  Aetna terminated Slayhi's

coverage based on High-Tech's representation, and refused to process Slayhi's claims for the roughly $30,000 in pregnancy- and birth-related medical costs that she incurred in September and October 2003.  On November 21, 2003, Aetna sent Slayhi a "Certification of Prior Group Health Plan Coverage" reflecting that her coverage with Aetna had been terminated as of September 1, 2003.  Slayhi Dep. Ex. 16.

As noted above, High-Tech sent Slayhi a notice dated November 17 advising her of her rights under COBRA.  Slayhi did not elect continuation coverage under COBRA.  Instead, she enrolled in her husband's health-care plan effective some time after November 17, 2003.  This left Slayhi with a gap in coverage for September and October 2003, leaving her personally liable for the roughly $30,000 in medical costs that Aetna did not cover.

In May 2006, Slayhi sued High-Tech in state court, bringing a claim under ERISA for reimbursement of her uncovered health-care expenses from September and October 2003.  High-Tech removed the case to this Court.

### B.  The Health-Insurance Policy

As described, High-Tech offers its full-time employees health-insurance coverage through Aetna.  Specifically, High-Tech and Aetna have a contract — a health-insurance policy — under which Aetna agrees to insure eligible High-Tech employees in return for premium payments from High-Tech.

The health-insurance policy specifies how much High-Tech must pay Aetna as a monthly premium for coverage of each High-Tech employee (about $285 for individual coverage, and about $414 for family coverage).  Slayhi Dep. Ex. 10 at HTI/Slayhi000017.  The policy further provides that High-Tech's premium payments are due in advance, on the first of each month.

The policy gives High-Tech "[a] grace period of 31 days after the due date . . . for the payment of each premium."  *Id.* at HTI/Slayhi000019.

The policy is silent about how High-Tech and its employees will divide the cost of health-insurance premiums among themselves.  That is left entirely to High-Tech.  High-Tech could require its employees to pay none of the premium, some of the premium, or all of the premium.  As it happens, in its employee manual, High-Tech generally agrees to bear seventy-five percent of the premium cost, while employees must bear the remaining twenty-five percent.  Slayhi Dep. Ex. 7 at HTI/Slayhi000250.  But this is a contractual and accounting matter between High-Tech and its employees, not between Aetna and High-Tech (or between Aetna and High-Tech's employees).

The policy's silence about the share of premiums to be paid by employees is one particular instance of the more general division of responsibility between High-Tech and Aetna that is reflected throughout the policy.  Roughly speaking, Aetna is responsible for claim-level decisions about paying benefits (e.g., to what extent employee $x$'s visit to doctor $y$ on date $z$ is covered), while High-Tech is responsible for plan-level decisions about covering employees (e.g, whether employee $x$ will be covered at all — for *anything* — under the Aetna policy).

Aetna's claims-level responsibility is spelled out in the policy section entitled "ERISA claim fiduciary," which provides:

> Aetna is a fiduciary with complete authority to review all denied claims for benefits under this policy.  This includes, but is not limited to, the denial of certification of the medical necessity of hospital or medical treatment.  In exercising such fiduciary responsibility, Aetna shall have discretionary authority to:
>
> > determine whether and to what extent employees are entitled to benefits; and

> construe any disputed or doubtful terms of this policy.
>
> Aetna shall be deemed to have properly exercised such authority unless Aetna abuses its discretion by acting arbitrarily and capriciously.

Slayhi Dep. Ex. 10 at HTI/Slayhi000021 (emphasis added).

High-Tech's plan-level responsibility is reflected not only in the provisions governing premium payments (described above), but also in the provisions governing coverage termination and nondiscrimination. As for nondiscrimination, the plan provides:

> In the management of this policy, [High-Tech] will act so as not to discriminate unfairly between persons in like situations at the time of the action. Aetna can rely on such action. It will not have to probe into the details.

*Id.* at HTI/Slayhi000015.

Just as Aetna relies entirely on High-Tech to not discriminate unfairly among its employees in managing the policy, so too does Aetna rely entirely on High-Tech to tell Aetna when a terminated employee's coverage should cease. The policy provides that an employee's coverage ends when, among other things, "employment ceases." *Id.* at HTI/Slayhi000052. High-Tech, not Aetna, determines when employment ceases:

> [High-Tech] will notify Aetna of the date your employment ceases for the purposes of termination of coverage under this Plan. . . . In figuring when employment will stop for the purposes of termination of any coverage, *Aetna will rely upon [High-Tech]* to notify Aetna. This can be done by telling Aetna or by stopping premium payments.

*Id.* (emphasis added).

## II.  DISCUSSION

### A.  Standard of Review

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).[1]  A dispute over a fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a fact is "genuine" only if the evidence is such that a reasonable jury could return a verdict for either party.  *Ohio Cas. Ins. Co. v. Union Pac. R.R.*, 469 F.3d 1158, 1162 (8th Cir. 2006).  In considering a motion for summary judgment, a court must assume that the nonmoving party's evidence is true.  *Taylor v. White*, 321 F.3d 710, 715 (8th Cir. 2003).

### B.  Identifying Slayhi's Claims

Under ERISA, plan participants such as Slayhi can generally bring two different types of claims for individual relief:

First, § 1132(a)(1)(B) allows participants to challenge, both retrospectively and prospectively, a denial of benefits.  Specifically, §1132(a)(1)(B) authorizes suits by a participant or beneficiary "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan[.]"  29 U.S.C. § 1132(a)(1)(B).  Claims under this section can be termed "benefits claims."

---

[1]The Court quotes the version of Rule 56 that became effective December 1, 2007.  The restyled rule is substantively the same as the earlier version of the rule.  *See* Fed. R. Civ. P. 56 advisory committee's note on 2007 amendments.

Second, participants can also sue under §1132(a)(3) "to obtain other appropriate equitable relief . . . to enforce any provisions of this title or the terms of the plan[.]" 29 U.S.C. §1132(a)(3). Although this catchall provision is broadly worded, the Supreme Court has placed significant limits on the "other appropriate equitable relief" that is available under §1132(a)(3). The precise scope of those limits is still uncertain, but roughly speaking, the Court has relegated claims for payment for withheld benefits to § 1132(a)(1)(B), while claims brought under § 1132(a)(3) may seek only non-monetary relief. *See Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 221 (2002) ("Because petitioners are seeking legal relief — the imposition of personal liability on respondents for a contractual obligation to pay money — § [1132(a)(3)] does not authorize this action."); *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 255-63 (1993) (finding that "[m]oney damages are, of course, the classic form of *legal* relief" and therefore are not "appropriate equitable relief" under § 1132(a)(3)).

In this case, Slayhi purports to bring a claim "for breach of fiduciary duty arising under [ERISA], 29 U.S.C. § 1132(a)(1)(B)." Complaint ¶3. As High-Tech points out, this phrasing mixes up two distinct types of claims: a claim for benefits under § 1132(a)(1)(B), on the one hand, and a claim for breach of fiduciary duty under § 1132(a)(3), on the other.

The court can scarcely blame Slayhi for her apparent confusion about what type of ERISA claim she should bring. The ERISA enforcement scheme, as interpreted by the courts, is bewilderingly complex. Judge Edward Becker described the ERISA regime as "unjust and increasingly tangled" and a "Serbonian bog." *DiFelice v. Aetna U.S. Healthcare*, 346 F.3d 442, 453-54 (3d Cir. 2003) (Becker, J., concurring);[2] *see also Aetna Health, Inc. v. Davila*, 542 U.S.

[2]"A Serbonian bog is a mess from which there is no way of extricating oneself." *DiFelice*, 346 F.3d at 454 n.1 (Becker, J., concurring).

200, 222 (2004) (Ginsburg, J., concurring) (quoting Judge Becker's concurrence in *DiFelice* ).

And the Eighth Circuit, acknowledging the complexity of ERISA's enforcement scheme, has

advised that:

> In order to obtain complete relief, a successful plaintiff may need
> to assert claims against both a plan and its sponsor and/or
> administrator and/or issuer of an insurance policy that provides
> benefits under the plan, asserting claims under §§ 1132(a)(1)(B)
> and(a)(3).

*Ross v. Rail Car Am. Group Disability Income Plan*, 285 F.3d 735, 741 n.7 (8th Cir. 2002).

High-Tech has construed Slayhi's complaint as raising claims under both § 1132(a)(1)(B)

and § 1132(a)(3) and has addressed both types of claims in its summary-judgment brief.  In

response, Slayhi continues to frame her arguments in terms of both sections of the statute.  Pl.

Mem. Opp. Def. Mot. S.J. ("Pl. SJ Opp.") at 10 ("Defendant is a proper party under either 29

U.S.C. 1132(a)(3) or 29 U.S.C. 1132(a)(1)(B).") [Docket No. 13].  Accordingly, the Court will

analyze both types of claims.

### C.  The Benefits Claim

High-Tech moves for summary judgment on Slayhi's § 1132(a)(1)(B) claim for benefits,

arguing that High-Tech is not a proper defendant with respect to such a claim.  Whether High-

Tech is a proper defendant under § 1132(a)(1)(B) is a surprisingly complex question.

Ultimately, however, the court agrees with High-Tech that in this case, the proper defendant

under § 1132(a)(1)(B) is High-Tech's insurer, Aetna, and not High-Tech itself.

### 1.  "The Plan" as Defendant

ERISA itself does not identify the proper defendant in suits for benefits.  Section 1132(d)

touches on the subject, providing as follows:

> (1) An employee benefit plan may sue or be sued under this title as an entity. . . .
>
> (2) Any money judgment under this title against an employee benefit plan shall be enforceable only against the plan as an entity and it shall not be enforceable against any other person unless liability against such person is established in his individual capacity under this title.

29 U.S.C. § 1132(d).  In an often-cited opinion, the Ninth Circuit observed, with no accompanying analysis, that this section means that "ERISA permits suits to recover benefits only against the Plan as an entity . . . ."  *Gelardi v. Pertec Computer Corp.*, 761 F.2d 1323, 1324 (9th Cir. 1985); *see also Ross v. Rail Car Am. Group Disability Income Plan*, 285 F.3d 735, 740-41 (8th Cir. 2002) (citing *Gelardi*).

High-Tech relies on *Gelardi* and *Ross* to argue, in its opening brief, that because High-Tech is not "the plan," it is not a proper defendant under § 1132(a)(1)(B).  Def. Mem. Supp. Mot. S.J. ("Def. SJ Mem.") at 19 [Docket No. 11].  To its credit, High-Tech changes its position in its reply brief and concedes that plan administrators can also be sued under § 1132(a)(1)(B).  Def. Reply Mem. at 4 n.1 [Docket No. 17].  It is worth explaining, though, why *Gelardi* was simply incorrect in suggesting that a suit for benefits can be brought *only* against "the Plan as an entity."

First, the text of §1132(d) does not compel the conclusion that ERISA plans, as entities, are the only possible defendants in suits for benefits.  Rather, subsection (1) of §1132(d) establishes that ERISA plans are *among* the possible defendants in suits for benefits.  And subsection (2) of § 1132(d) establishes that, once a money judgment has been rendered against an ERISA plan as an entity, that judgment is enforceable only against the plan itself, unless some other party has also been found liable "in his individual capacity" under ERISA.  By its terms,

then, subsection (2) speaks only to the *enforceability* of a money judgment that has been rendered against a plan; it does not foreclose the possibility that a money judgment might be rendered against someone other than a plan.  *See Everhart v. Allmerica Fin. Life Ins. Co.*, 275 F.3d 751, 757 (9th Cir. 2001) (Reinhardt, J., dissenting) (stating that § 1132(d) "clearly applies only to suits against ERISA plans, and not to suits that may be brought against other parties under ERISA").  Indeed, at least one court of appeals has gone so far as to hold that § 1132(d) is entirely irrelevant to suits for benefits under § 1132(a)(1)(B).  *See Hunt v. Hawthorne Assocs., Inc.*, 119 F.3d 888, 908 n.54 (11th Cir. 1997) (observing that § 1132(d) "contemplates legal relief and does not apply to an action to recover benefits under section [1132(a)(1)(B)].").  *But see Hall v. LHACO, Inc.*, 140 F.3d 1190, 1196 (8th Cir. 1998) (citing § 1132(d) for the proposition that benefits due under § 1132(a)(1)(B) "can only be obtained against the Plan itself").

Second, in some cases — such as this one — the "plan" simply does not exist as an entity.  *See, e.g., Hunt*, 119 F.3d at 907 (observing, in a suit for retirement benefits, "[n]or can the Plan as an entity provide any relief; the Plan alone is simply a written instrument executed by [the employer] and [the union]."").  The notion of a plan as a freestanding entity fits well with pension plans, which were Congress's primary focus in drafting ERISA.  *See generally DiFelice*, 346 F.3d at 454-55 (Becker, J., concurring) (discussing history and purposes of ERISA).  Pension plans often do have an independent existence (in the form of trusts, for instance).  And some self-funded health-insurance plans may also exist as trusts or other freestanding entities.  More commonly, however (particularly where small employers are involved), a health-insurance "plan" is simply a contract between an employer and an insurer.  Needless to say, a contract cannot be haled into court.

-12-

Third, and most important from a practical standpoint, the Eighth Circuit has rejected the notion that only a "plan" can be sued under § 1132(a)(1)(B).  In *Layes v. Mead Corp.*, the court held that a claim for disability benefits could not be brought against the plaintiff's employer, but could be brought against the insurance company that administered the employer's disability-benefit plan.  132 F.3d 1246, 1249-50 (8th Cir. 1998) ("CNA [the insurer] was at all relevant times the sole administrator of the long-term disability plan offered by Mead [the employer].  Thus, Mead was not a proper party defendant. . . . We turn, then, to Layes' action against CNA for long-term disability benefits.").  At the very least, then, in this circuit, certain plan administrators, as well as plans themselves, can be sued under § 1132(a)(1)(B).

## 2.  Plan Administrators As Defendants

Under ERISA, the term "administrator" has a particular meaning.  Section 1002(16)(A) defines an "administrator" as:

> (i) the person specifically so designated by the terms of the instrument under which the plan is operated;
>
> (ii) if an administrator is not so designated, the plan sponsor; or
>
> (iii) in the case of a plan for which an administrator is not designated and a plan sponsor cannot be identified, such other person as the Secretary may by regulation prescribe.

29 U.S.C. § 1002(16)(A).  This definition is exhaustive; for every ERISA plan, there is necessarily an administrator under the statute.

In this case, the "instrument under which the plan is operated" does not "specifically so designate[]" an administrator.  Instead, the plan document identifies Aetna as the "ERISA claim fiduciary," Smith Aff. Ex. B at HTI/Slayhi000021, not as the plan "administrator."  Accordingly,

because High-Tech is the "plan sponsor," *see* § 1002(16)(B), it is, by operation of law, the "administrator."

This raises two questions:  First, does the fact that High-Tech is defined as the "administrator" of the plan under § 1002(16)(A) — *by itself* — make High-Tech a proper defendant under § 1132(a)(1)(B)?  Second, if the answer to the first question is "no," then does the fact that High-Tech exercises plan-level administrative responsibility make it a proper defendant under § 1132(a)(1)(B)?  (Recall that, although Aetna is entirely responsible under the plan for claim-level decisions about benefits, High-Tech is responsible for plan-level decisions about premium collection and employee enrollment.)

Neither of these questions is answered directly by Eighth Circuit case law.  In particular, the Eighth Circuit has not addressed the relationship between the definition of "administrator" in § 1002(16)(A) and benefits claims brought under § 1132(a)(1)(B).  In *Layes*, the insurance company being sued for benefits was both a de facto plan administrator (i.e., the company in fact administered the plan) and a de jure administrator (i.e., the company was defined as the administrator by § 1002(16)(A)).  132 F.3d at 1249.  *Layes* therefore left open the question whether and to what extent a party that is defined as the plan administrator by statute, but that does not in fact do any administering of the plan (or administers only some aspects of a plan), can be sued under § 1132(a)(1)(B).  Likewise, *Layes* left open the complementary question whether and to what extent a party that in fact administers a plan, but that is not identified by the statute as a plan administrator, can be sued under § 1132(a)(1)(B).

With respect to the second question — whether a de facto but non-statutory administrator can be sued under § 1132(a)(1)(B) — the Eighth Circuit has sent mixed signals within the same opinion.  In *Hall v. LHACO, Inc.*, decided shortly after *Layes*, the court said that it would

-14-

"reserve for another time the question of whether a party other than the one designated in ERISA plan documents can be sued under § [1132(a)(1)(B)] as a 'de facto' plan administrator."  140 F.3d 1190, 1195 (8th Cir. 1998).  This seems to leave open the question whether a de facto but non-statutory plan administrator — such as Aetna in this case — is a proper defendant in a benefits action.  But *Hall* also characterized *Layes* as having "held that the proper party against whom a claim for ERISA benefits may be brought 'is the party that controls administration of the plan,' not the plan participant's employer."  40 F.3d at 1194 (purportedly quoting *Layes*).

If *Layes* in fact held that "the party that controls administration of the plan" is the proper defendant in an ERISA benefits action, this would seem to establish that a de facto plan administrator — by definition, the party that in fact "controls administration of the plan" — could be sued under § 1132(a)(1)(B).  But, as noted above, *Layes* did not so hold; rather, *Layes* held that (1) an employer that does *not* control plan administration (and is not a statutory administrator under § 1002(16)(A)) is *not* a proper defendant, and (2) a statutory plan administrator that *does* control plan administration *is* a proper defendant.[3]  *Layes* implied nothing — one way or another — about whether a de facto but non-statutory administrator could be sued under § 1132(a)(1)(B).

Eighth Circuit case law does not, therefore, establish what parties, other than a statutory plan administrator that also administers a plan by making claim-level decisions about benefits, are subject to suits for benefits under § 1132(a)(1)(B).  And while *Layes* forecloses benefits

---

[3]Indeed, the language quoted in *Hall* and characterized as *Layes*'s holding about suing "the party that controls administration of the plan" was not even part of *Layes*'s main text, let alone *Layes*'s holding — this language comes from the Eleventh Circuit's decision in *Garren v. John Hancock Mutual Life Insurance Co.*, 114 F.3d 186, 187 (11th Cir. 1997), and is found in a parenthetical remark in *Layes* that follows a "see" citation to *Garren*.  *Layes*, 132 F.3d at 1249.

actions against employers where a unitary de facto/statutory plan administrator other than the employer exists, *Layes* does not foreclose such an action against an employer that is also a statutory administrator (as High-Tech is in this case).

### 3.  Defendants and Relief Must Be Congruent

Although nothing in the reasoning of either *Layes* or *Hall* suggests whether an action against statutory, but not actual, plan administrators is permissible under ERISA, one could justify allowing such suits by way of a syllogism:  If case law permits benefits suits against "plan administrators," and if ERISA defines some employers as "plan administrators" as a matter of law regardless of whether they do any actual administering, then such employers should be subject to suits for benefits.

This syllogism  is unsatisfactory, though, because no substantive rationale underpins it, and because it does not follow ineluctably from the statutory language of ERISA.  The most extended discussion of the rationale for permitting suits under § 1132(a)(1)(B) against de facto plan administrators (such as Aetna in this case) appears in the Eleventh Circuit's decision in *Hunt v. Hawthorne Assocs., Inc.*, 119 F.3d 888 (11th Cir. 1997).  That same rationale, a key aspect of which has been adopted by the Eighth Circuit in *In re Vorpahl*, 695 F.2d 318 (8th Cir. 1982), does not support allowing suits for benefits under § 1132(a)(1)(B) against statutory administrators that do not control claim-specific decisions about benefits (such as High-Tech in this case).

*Hunt* was a suit for benefits brought by a retired airline pilot.  The retirement plan at issue was structured so that the airline itself — the then-bankrupt Eastern Airlines — had the ultimate authority to award or deny benefits, while an administrative committee was responsible for managing plan assets and for overseeing plan operations (apart from awarding benefits).  119

F.3d at 893.  The pilot, Hunt, had dismissed Eastern Airlines from the suit and sought to enforce

his claim for benefits against the administrative committee alone.  *Id.* at 902-03.  The Eleventh

Circuit held that he could not do so.  *Id.* at 908-09.

    To reach this conclusion, *Hunt* examined the nature of the remedy provided under

§ 1132(a)(1)(B).  The court determined that while an award of benefits under this section results

in monetary relief, such an award is equitable, and not legal, in nature.  That is, an award of

benefits under § 1132(a)(1)(B) is in the nature of "an *in personam* order enjoining the payment

of benefits" and, accordingly, "must issue against a party capable of providing the relief

requested."  *Id.* at 908.  Under the terms of the plan at issue in *Hunt*, Eastern Airlines had final

authority to decide whether to award benefits on a particular claim.  *Id.* at 909.  Accordingly,

Eastern Airlines was the only proper defendant under § 1132(a)(1)(B) — and, because Eastern

Airlines had been dismissed from the suit, Hunt's benefits claim failed as a matter of law.  *Id.* at

911 ("It is clear that Eastern, not [the committee], bears ultimate responsibility for the denial of

Hunt's lump-sum benefit. . . . We therefore reject the district court's *sub silentio* revision of the

Plan which enabled the court to direct [the committee] to pay Hunt his lump-sum benefit.").

    Although the Eighth Circuit has not expressly adopted the analysis in *Hunt*, it has

endorsed the key premise underlying *Hunt*'s analysis.  In *In re Vorpahl*, the Eighth Circuit held

that suits under § 1132(a)(1)(B) are equitable in nature and therefore need not be tried to a jury.

695 F.2d at 321.  The Court therefore finds that the Eighth Circuit would likely follow the

approach outlined in *Hunt*.

    Accordingly, the proper defendant under § 1132(a)(1)(B) is the party with authority,

under the relevant plan documents, to pay benefit claims from plan assets.  In this case, that is

Aetna, not High-Tech.  As described above, the High-Tech plan is funded through an insurance

policy issued by Aetna, and, under the terms of that policy, Aetna has the final authority to decide individual claims for benefits.  Put another way, if the court ordered Aetna to pay benefits in this case, such a payment would come from the insurance plan, since Aetna is the insurer.  But if the court ordered High-Tech to pay benefits in this case, such a payment would not come from the insurance plan; it would instead come from High-Tech's assets.  Payment from High-Tech's assets is not the payment of plan benefits, but the payment of damages.  Such payment could satisfy only a legal judgment, not an equitable judgment.

To be clear:  The Court has concluded only that High-Tech is not liable under one particular section of ERISA:  § 1132(a)(1)(B).  The Court has not concluded that High-Tech is immune from *any* liability under ERISA.  To the contrary, as discussed below, the Court believes that High-Tech is a proper defendant under § 1132(a)(3).  But High-Tech's liability, if any, must be congruent with its authority under the plan.  To the extent that High-Tech has administrative responsibilities under the plan, those responsibilities relate solely to the collection of employee premiums and to enrolling and disenrolling employees at the plan level.  High-Tech has no responsibility for paying benefits at the claim-specific level.  Therefore an order directing the payment of benefits under § 1132(a)(1)(B) would not be congruent with High-Tech's authority.

Because High-Tech is not a proper defendant under § 1132(a)(1)(B), the Court grants High-Tech's summary-judgment motion with respect to this claim.  The Court will, however, grant Slayhi leave to amend her complaint to name Aetna as a defendant *if* she can do so consistently with Rule 11 of the Federal Rules of Civil Procedure.  That is a big "if."  Slayhi will have to determine, among other things, whether her claim against Aetna is now barred by the

statute of limitations and, if so, whether that claim might nevertheless be "saved" by the relation-back provisions of Rule 15(c).  The Court expresses no opinion on these issues.

### D.  The Breach-of-Fiduciary-Duty Claim

The Court construes Slayhi's complaint — as does High-Tech — to raise a claim for breach of fiduciary duty under § 1132(a)(3).  The Court agrees with High-Tech that Slayhi cannot recover a monetary judgment under this section of ERISA.  *See Great-West*, 534 U.S. at 221.  The Court finds, however, that "other appropriate equitable relief" is available to Slayhi under § 1132(a)(3).  Specifically, the Court finds that it can order High-Tech (1) to accept premium payments from Slayhi for September and October 2003, (2) to inform Aetna that High-Tech was mistaken when it told Aetna that Slayhi had not made required premium payments for September and October 2003, and (3) to instruct Aetna that it must reinstate Slayhi under the plan, treat her as having been a covered employee from September 1, 2003 through her termination date of November 1, 2003, and process her claims from that period in accordance with the terms of the plan.

### 1.  Liability under § 1132(a)(3)

The Court finds, contrary to High-Tech's contention, that the undisputed facts establish that High-Tech is a "fiduciary" under ERISA.  High-Tech is therefore a proper defendant under § 1132(a)(3).

As relevant to this case, "a person is a fiduciary with respect to a plan to the extent . . . he has any discretionary authority or discretionary responsibility in the administration of such plan."  29 U.S.C. § 1002(21)(A).  This definition is deliberately broad and envisions that plans may have multiple fiduciaries, each of which is a fiduciary only with respect to some particular

aspect of the plan (hence the statute's limiting language describing a person as a fiduciary only "to the extent" that the person meets specified statutory conditions).

The plan language in this case, which defines Aetna as "a fiduciary with complete authority to review all denied the claims for benefits under this policy," does not strip High-Tech of fiduciary status.  Slayhi Dep. Ex. 10 at HTI/Slayhi000021.  First, the plan language itself does not purport to do so; it defines Aetna as "*a* fiduciary," not "*the* fiduciary."  Second, plan language cannot supersede the statutory definition of a fiduciary.  In this case, the undisputed facts demonstrate that High-Tech exercised "discretionary authority or discretionary responsibility" with respect to collecting the  employee's share of her health-insurance premium.  29 U.S.C. § 1002(21)(A).

The plan itself — that is, the contract between Aetna and High-Tech — is silent with respect to the employee's share of health-insurance premiums.  Instead, the plan provides only that "[t]he Policyholder [i.e., High-Tech] will pay premiums in advance," and allows a "grace period of 31 days after the due date . . . for the payment of each premium."  Slayhi Dep. Ex. 10 at HTI/Slayihi000019.  The plan also establishes the total amount of the premium per employee for individual and family coverage.  *Id.* at HTI/Slayhi000017.  But Aetna is utterly indifferent to what share (if any) of this premium is paid to High-Tech by the employee; Aetna's only interest is in receiving the premium payment due from High-Tech.

High-Tech's discretionary authority with respect to collecting employee premiums is further reflected in the plan provisions governing insurance during FMLA leave.  The plan requires an employee on FMLA leave to "agree to make any contributions *required by* your Employer [i.e., High-Tech] to continue coverage."  *Id.* at HTI/Slayhi000074 (emphasis added).  The plan further provides that coverage "will not be continued beyond. . . [t]he date you are

*required* to make any contribution and you fail to do so." *Id.* (emphasis added).  The

contributions "required" of an employee such as Slayhi under this section are only those

contributions that High-Tech chooses to require; High-Tech could, consistently with this

provision, require *no* contribution from employees during FMLA leave, or require contributions

only under certain circumstances or in a particular manner.

 By means of its form authorizing Slayhi's FMLA leave, High-Tech committed to

exercise its discretion in collecting health-insurance premiums from Slayhi during her leave in a

particular way.  The request form executed by Slayhi states that during FMLA leave, she "must

make [her] share of the premiums when due."  Slayhi Aff. Ex. D.  But this form does not say

*when* those premiums are due.  That information is found in High-Tech's response form

authorizing Slayhi's FMLA leave:

> If you normally pay a portion of the premiums for your health
> insurance, you must continue to make your portion of the premium
> payments while on leave . . . .  You have a minimum *30-day grace*
> *period* in which to make payment.  If payment is more than 30
> days late, your group health insurance will be canceled, *provided*
> *we notify you in writing at least 15 days before* the date your
> health coverage will lapse.

Slayhi Aff. Ex. E.  As this language reflects, High-Tech has discretion to decide not only

*whether* an employee such as Slayhi must pay a share of her health-insurance premium, but also

*when* and *how*.  Accordingly, High-Tech is an ERISA fiduciary with respect to that aspect of

plan administration.[4]

_____

 [4]High-Tech may also be a fiduciary under § 1002(21) by virtue of its status as the
statutory plan administrator.  As discussed above, because the plan does not specifically
designate an administrator, High-Tech — the plan sponsor — is defined as the "administrator"
by § 1002(16)(A).  Interpretive regulations from the Department of Labor state that "a plan
administrator or a trustee of a plan must, by the very nature of his position, have 'discretionary
authority or discretionary responsibility in the administration' of the plan within the meaning of

As an ERISA fiduciary, High-Tech made a commitment to Slayhi to do two things: (1) to provide her a thirty-day grace period for each premium payment, and (2) to refrain from instructing Aetna to cancel her coverage until High-Tech provided Slayhi fifteen days' advance written notice of coverage termination. High-Tech betrayed its commitments. Slayhi's FMLA leave began on September 1, 2003, and her premium payment for that month was due on that day, but should not have been considered late before September 30. On October 1, when High-Tech determined that Slayhi had not paid her premium for September, it could have sent Slayhi a written notice informing her that her coverage would be terminated in fifteen days. High-Tech did not do so. Instead, without ever having sent Slayhi the advance written notice of termination that High-Tech promised her, High-Tech terminated her employment as of November 1 and instructed Aetna that Slayhi had failed to make required premium payments since September 1.

Obviously, High-Tech treated Slayhi terribly, causing her to become liable for about $30,000 in health-care costs that she would not have been liable for if High-Tech had merely lived up to its word. But rather than taking responsibility for its actions, High-Tech seeks to avoid any consequences for its failure to honor its commitments by arguing not only that it is not an ERISA fiduciary — an argument that, as described above, is plainly meritless — but also that the promises it made to Slayhi in the leave-authorization form are unenforceable under ERISA. The Court disagrees.

ERISA requires that covered employee-benefit plans be in writing. 29 U.S.C. § 1102(a)(1) ("Every employee benefit plan shall be established and maintained pursuant to a written instrument."). Further, ERISA requires that plans provide a formal procedure for their

---

[§ 1002(21)(A)(iii) of ERISA]. Persons who hold such positions will therefore be fiduciaries." 29 C.F.R. § 2509.75-8.

amendment.  29 U.S.C. § 1102(b)(3).  In light of these provisions, numerous courts have held

that ERISA "precludes oral or informal plan amendments to a plan, whether by estoppel or

otherwise."  *Jensen v. Sipco, Inc.*, 38 F.3d 945, 953 (8th Cir. 1994).  As a result, employees

seeking to recover under ERISA on the basis of an employer's extra-plan promises are often out

of luck.

      This does not mean, however, that employers are entirely free to lie about their ERISA

plans without fear of liability.  For although an ERISA plan cannot be informally amended,

ambiguities in an ERISA plan can be informally interpreted (at least in the Eighth Circuit).  *See*

*Fink v. Union Cent. Life Ins. Co.*, 94 F.3d 489, 492 (8th Cir. 1996) ("Courts may apply the

doctrine of estoppel in ERISA cases only to interpret ambiguous plan terms. . . ."); *Slice v. Sons*

*of Norway*, 34 F.3d 630, 634-35 (8th Cir. 1994).  Thus, if an employee seeks to recover under

ERISA on the basis of an employer's extra-plan promise, the employee must first demonstrate

that the promise was not a modification of an ERISA plan, but rather a plausible interpretation of

an ambiguity in an ERISA plan.  *See Slice*, 34 F.3d at 635.  The Court finds that High-Tech's

promise of a grace period and a pre-termination warning notice in its FMLA-authorization form

is just such an enforceable interpretation of an ambiguous plan provision.

      As noted above, the plan itself says that employees on FMLA leave must agree to make

"any contributions *required by*" High-Tech, and that coverage under the plan will terminate as of

the date an employee is "*required* to make any contribution" but fails to do so.  Slayhi Dep. Ex.

10 at HTI/Slayhi 00074 (emphasis added).  But what is a "required" contribution?  The plan does

not say.  Nor does the "Employee Benefits Summary" that High-Tech provided to Slayhi.  That

document, which presumably qualifies as a "Summary Plan Description" under ERISA, 29

U.S.C. § 1022, and is therefore part of High-Tech's ERISA plan, specifies the dollar amount of

the employee share of the premium but is silent as to how that share will be collected.  Slayhi Dep. Ex. 9 at SlayhiPL000007-10.

Outside of the ERISA plan and the benefits summary, High-Tech discusses in two documents the contributions that employees must make toward their health-insurance coverage. These two documents give meaning to the word "required" as used in the plan.  First, in its employee manual, High-Tech told Slayhi that she was "required to make [her] portion of the monthly premium payments on the 1st of every month."  Slayhi Dep. Ex. 7 at HTI/Slayhi00249. Second, in the leave-authorization form, High-Tech promised Slayhi that if she failed to make the "required" payment on the first of the month, High-Tech would give her thirty days to remedy that failure before High-Tech would act to terminate her health coverage.  Slayhi Aff. Ex. E.  The authorization form then went further and promised Slayi that, even if she did not remedy her failure to pay a premium on the first day of a month, High-Tech would not act to terminate her medical insurance without first giving her notice.  *Id.*  The promises in the leave-authorization form, together with the employee manual, establish what High-Tech "required" of Slayhi with respect to her share of her health-insurance premiums.

In sum, the Court concludes that, in seeking to make High-Tech live up to its promises, Slayhi is not seeking to enforce an informal amendment to an ERISA plan, but instead seeking to enforce an informal interpretation of an ambiguity in an ERISA plan.  This the Eighth Circuit permits her to do.

High-Tech makes two additional arguments to avoid liability that must be addressed. First, High-Tech suggests that a provision of the insurance plan entitled "misstatements" justified Aetna's termination of Slayhi's health insurance based on High Tech's report of

-24-

Slayhi's failure to pay her premiums for September and October 2003.  The insurance plan provides:

> Misstatements[.]  If any fact as to a person to whom the insurance relates is found to have been misstated, a fair change in premiums will be made.  If the misstatement affects the existence or amount of insurance, the true facts will be used to decide if insurance is in force and its amount.

Slayhi Dep. Ex. 10 at HTI/Slayhi000014.  According to High-Tech, the "true fact" is that Slayhi did not pay her premium on time, and based on that true fact, she was not entitled to coverage as of September 1, 2003.  Def. S.J. Mem. at 20 ("High-Tech committed no abuse of discretion in its decision to report to Aetna the 'true fact' of Slayhi's failure to pay premiums. . . .  [A] straightforward reading of the Plan's plain language renders her uncovered by the Plan as of September 1, 2003.").

The Court doubts whether this "misstatements" provision was intended to apply at all in a situation like this one, involving premium payments.  Even if it did, however, it would not relieve High-Tech of liability.  It is, of course, true (and undisputed) that Slayhi did not pay her premium on September 1 or October 1.  But this fact alone does not mean that she was not entitled to coverage.  As discussed above, her coverage would terminate only if she failed to make a premium payment as "required."  Although it is a "true fact" that Slayhi failed to make a payment, it is not a "true fact" that she failed to make a payment *as required*, given High-Tech's promises in its FMLA-authorization form.

Second, and finally, High-Tech argues that Slayhi's suit fails because she did not exhaust administrative remedies in appealing Aetna's denial of her benefit claims.  The Court disagrees.  Under the circumstances of this case, Slayhi was excused from following the plan's appeal

processes both because doing so would have been futile, and because Aetna never provided Slayhi the required notice of denial of the claims at issue in this suit.

The plan in this case sets forth, in a provision titled "Appeals Procedure," a detailed procedure for appealing benefit denials. Slayhi Dep. Ex. 10 at HTI/Slayhi000086. That provision says in part:

> An Appeal is defined as a written request for review of a decision that has denied in whole or in part, after consideration of any relevant information, a request for: claim payment, certification, eligibility, referral, et cetera.

> An Appeal must be submitted to Aetna within 60 days of the date Aetna provides notice of denial. . . .

*Id.* As a general rule, employees who seek benefits must first exhaust internal review procedures such as those set forth in the plan in this case before suing under ERISA. *See Kinkead v. Sw. Bell Corp. Sickness & Accident Disability Benefit Plan*, 111 F.3d 67, 68 (8th Cir. 1997).

This general rule gives way, however, when exhaustion would be futile. *See generally* 2 Ronald J. Cooke, *ERISA Practice & Procedure* § 8:19 at 8-181 (2d ed. 2007) (collecting cases). In this case, exhaustion would have been futile because Aetna's decision not to process Slayhi's claims for services was based entirely on High-Tech's representation that Slayhi had not paid the required premium. Aetna did nothing wrong in relying on that representation; rather, the error was High-Tech's in reporting Slayhi's failure to pay her premiums despite High-Tech's promise, in the FMLA-authorization form, that it would provide her both a grace period for payment and advance notice before terminating her coverage. Indeed, when Slayhi called Aetna after she learned that her health insurance had been terminated as of September 1, Aetna quite naturally told Slayhi to contact High-Tech. Slayhi Dep. at 33.

Moreover, Aetna failed to provide Slayhi the notice of denial of benefits required under

ERISA.  Under § 1133, employee-benefit plans must:

> (1) provide adequate notice in writing to any participant or
> beneficiary whose claim for benefits under the plan has been
> denied, setting forth the specific reasons for such denial, written in
> a manner calculated to be understood by the participant, and

> (2) afford a reasonable opportunity to any participant whose claim
> for benefits has been denied for a full and fair review by the
> appropriate named fiduciary of the decision denying the claim.

29 U.S.C. § 1133.  Federal regulations further specify the required timing and content of notices

of denial.  *See* 29 C.F.R. § 2560.503-1(f).

Aetna never provided Slayhi with notices of denial with respect to her claims for benefits

for the services she received in September and October 2003.  High-Tech asks the Court to

overlook this fact, arguing that Slayhi was sufficiently informed that her claims were denied by

way of a "Certification of Prior Group Health Plan Coverage" provided to Slayhi by Aetna that

indicated that her coverage with Aetna terminated on September 1, 2003.  Def. Reply Mem. at 6-

7; Slayhi Dep. Ex. 16 (Certification of Prior Group Health Plan Coverage).  Far from

undermining Slayhi's argument that exhaustion would have been futile, however, this document

supports her argument.  In particular, Aetna's provision of this document, and Aetna's failure to

provide claim-specific notices of denial, indicates that the decision to cut off Slayhi's coverage

resulted from a plan-level decision about eligibility.  That plan-level decision was made by

High-Tech, not Aetna, when High-Tech chose to inform Aetna (incorrectly) that Slayhi had

failed to make her required premium payments for September and October 2003.  Accordingly,

Slayhi's suit is not barred by her failure to exhaust Aetna's internal appeal procedures.

2.  The Appropriate Remedy

Having rejected High-Tech's defenses to liability under § 1132(a)(3), the Court turns to the question of the appropriate remedy.  High-Tech argues that because Slayhi seeks monetary relief in the form of reimbursement for health-care expenses, her claim under § 1132(a)(3) fails because monetary relief is not "other appropriate equitable relief" under the statute.  The Court agrees that monetary relief is not available under § 1132(a)(3).  *See Great-West*, 534 U.S. at 221; *Mertens*, 508 U.S. at 255; *Delcastillo v. Odyssey Res. Mgmt., Inc.*, 431 F.3d 1124, 1131 (8th Cir. 2005) ("[O]nly equitable relief, not money damages, may be awarded under § 1132(a)(3).").[5] Accordingly, High-Tech is entitled to summary judgment that Slayhi is not entitled to a money judgment against it on her § 1132(a)(3) claim.

This is not to say, however, that Slayhi has no right to relief against High-Tech under § 1132(a)(3).  Specifically, "other appropriate equitable relief" in this case could include an order directing High-Tech (1) to accept premium payments from Slayhi for September and October 2003, (2) to inform Aetna that High-Tech was mistaken when it told Aetna that Slayhi had not made required premium payments for September and October 2003, and (3) to instruct Aetna that it must reinstate Slayhi under the plan, treat her as having been a covered employee from September 1, 2003 through her termination date of November 1, 2003, and process her claims from that period in accordance with the terms of the plan.  Similar relief has been awarded by district courts and upheld by courts of appeals in several cases, including by the

---

[5]It is arguable, as Justice Ginsburg noted in her concurrence in *Aetna Health, Inc. v. Davila*, that even under *Great-West* and *Mertens*, monetary relief under § 1132(a)(3) could be available against fiduciaries, though not against non-fiduciaries.  542 U.S. 200, 223-24 (2004) (Ginsburg, J., concurring).  Most courts of appeals, however, have rejected this argument, and the Court believes that the Eighth Circuit would as well.  *See, e.g., Pereira v. Farace*, 413 F.3d 330, 341 (2d Cir. 2005); *Callery v. U.S. Life Ins. Co.*, 392 F.3d 401, 408-09 (10th Cir. 2004).

Eighth Circuit in *Howe v. Varity Corp.*, 36 F.3d 746, 756 (8th Cir. 1994) (holding that plaintiffs were entitled under § 1132(a)(3) "an injunction reinstating them as members of the M-F Welfare Benefits Plan under the terms of that plan as it existed at the time of retirement"), *aff'd*, 516 U.S. 489 (1996).[6]  Further, if Aetna is added as a party to this case, the Court could, of course, directly order Aetna to reinstate Slayhi's coverage for September and October 2003.

Needless to say, the Court will not enter an order against High-Tech or Aetna (or both) reinstating's Slayhi's coverage until Slayhi first establishes that High-Tech or Aetna (or both) are liable to her.  Further, such a reinstatement order would be conditional on Slayhi's paying to High-Tech her share of her health-insurance premium for that period, and High-Tech would be required to pay to Aetna (if it has not already done so) Slayhi's entire premium for that period.

## ORDER

Based on the foregoing and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

---

[6]*See also Mathews v. Chevron Corp.*, 362 F.3d 1172, 1185-86 (9th Cir. 2004)  (upholding order under § 1132(a)(3) that directed a retirement plan to modify its records to reflect that the plaintiffs were covered under the plan and to treat them as participants in the plan); *Bowerman v. Wal-Mart Stores, Inc.*, 226 F.3d 574, 592-93 (7th Cir. 2000) (holding that, as a remedy for breach of fiduciary duty under § 1132(a)(3), the plaintiff should be given the chance to make a premium payment for past coverage and, thereafter, the insurance plan would have to process the plaintiff's claims for the period to which the premium payment related); *Atwood v. Swire Coca-Cola, USA*, 482 F. Supp. 2d 1305, 1316-17 (D. Utah 2007) (holding that ordering an employer to direct its insurer to retroactively "instate" an employee in an insurance plan is appropriate relief under § 1132(a)(3)).  *But see Alexander v. Bosch Auto. Sys., Inc.*, 232 Fed. Appx. 491, 496-99 (6th Cir. 2007) (holding that an order of retroactive "instatement" in an employee-benefit plan is not appropriate relief under § 1132(a)(3) because the remedy is more like contractual reformation than reinstatement); *Regents of Univ. Mich. v. Otis Spunkmeyer, Inc.*, No. 03-72985, 2006 WL 542979, 2006 U.S. Dist. LEXIS 8476, at *14-15 (E.D. Mich. Mar. 6, 2006) (distinguishing *Mathews* and refusing to order reinstatement in a health-insurance plan as relief under § 1132(a)(3)).

1.      Defendant's motion for summary judgment [Docket No. 6] is GRANTED IN

PART and DENIED IN PART as follows:

    a.      Plaintiff's claim for benefits under 29 U.S.C. § 1132(a)(1)(B) against

        defendant High-Tech Institute, Inc. is DISMISSED WITH PREJUDICE

        AND ON THE MERITS.

    b.      Plaintiff's claim for relief under 29 U.S.C. § 1132(a)(3) is DISMISSED to

        the extent that plaintiff seeks monetary relief from defendant High-Tech

        Institute, Inc., but not to the extent that she seeks "other appropriate

        equitable relief."

    c.      Defendant's motion is DENIED in all other respects.

2.      Plaintiff is GRANTED LEAVE to file an amended complaint that:

    a.      Brings a separate, clearly identifiable claim for "other appropriate

        equitable relief" under 29 U.S.C. § 1132(a)(3).

    b.      Specifies the relief sought by plaintiff under 29 U.S.C. § 1132(a)(3).  And

    c.      Names Aetna Life Insurance Company as a defendant with respect to

        plaintiff's claims under both § 1132(a)(1)(B) and § 1132(a)(3) of U.S.C.

        Title 29 *if* such claims can still be made against Aetna consistently with

        Rule 11 of the Federal Rules of Civil Procedure.

Dated: December 3, 2007                         s/Patrick J. Schiltz
                                          Patrick J. Schiltz
                                          United States District Judge